Our first case this morning is SYSTEM FUELS v. United States. Mr. Lester. May it please the Court. There are four issues on appeal before this Court this morning, and I apologize for my cold, too, and I promise not to breathe too heavily on you. There's a lot of other cases dealing with these same issues, hitting about the same time, aren't there? There are, Your Honor, and I'll just identify the four issues, and I can tell you, at least, for cases that have been argued before this Court, sort of what the other cases are, so that the Court can put them together. Has any effort been made on the part of the government to put some of these issues together? I think the Court of Federal Claims does try, but they really don't have much. We've done that in the past. We are struggling with how to do it now because there are issues in this case that are in two other sets of cases, but that all don't necessarily relate together. And those cases relate to this, but some others, and so we're going to try to put something together with the future appeals that correlates, at least tries to correlate. But at least for these cases, we're going to have to figure it out, correct? Yes, yes. Okay, why don't you go to the issue then? Right. The first four issues are, the first is the methodology for causation that the trial court applied. The second issue is whether or not the government should be entitled to offset the benefit that the contractor got from the delay in its payment of a one-time fee. That issue was argued last month in a case called Dominion Resources. Then there are two issues on cross-appeal from the plaintiff. One is the cost of capital markup. That issue was argued earlier this week on Tuesday in the other system appeals case that was before panel Tuesday afternoon. And then a similar issue on interest on borrowings is before the court that was argued in Energy Northwest Tuesday morning. And finally, the plaintiff has cross-appealed the trial court's damages determination with capital suspense loaders and its determination that the claim there was excessive. Judge Newman and I had the other system appeals case. Yes, yes, Your Honor. So just with regard to the very first issue, I don't think there's a big dispute about that one. The trial court issued its decision on causation before this court issued its decisions in Pacific Gas and Yankee Atomic. You both agree, have you not, that it requires a fresh look? We do. We challenge the trial court's methodology, both its failure to apply the 1987 rate this court applied in Yankee and Pacific Gas and the way that it allocated burdens. If the court remands this case simply directing the court to apply the lessons from Yankee and Pacific, that should take care of the issue. And I don't think there's a dispute about that between the parties at this point. The other issue that the government has appealed is whether or not the government should be entitled to, as a matter of law, be entitled to pursue an offset for the benefit that the contractor gains from being able to defer payment of its one-time fee. Hasn't this effectively been addressed in Yankee Atomic? It has not, Your Honor. In Yankee Atomic, this court held that the one-time fee is not now due, and so the government can't collect the fee, can't take a deduct from damages to collect the fee, because until DOE begins performance or is about to begin performance, DOE is not entitled to collect the fee. But the issue we have here is the other part of Yankee Atomic, which talks about how we measure causation, and that is the court identifying in Yankee Atomic the need for the plaintiff to identify what costs and activities it would have incurred in the but-for world, and that to measure causation, then the trial court identifies those costs and activities and compares them to the costs that were actually incurred to identify incrementality. As a part of that type of analysis, one cost that the contractor would have to have incurred had DOE timely performed, in this particular case, would have to have paid the one-time fee that it has not paid. That fee was $49 million plus a very low rate of interest that applies to it. So in the but-for world, it would have had to come up with that money. We presented evidence for the trial court that, in fact, although System Fuels had collected the fee from its rate payers, it had actually used that fee for other operating costs. And so it used that, as its witness testified, as a form of internal financing. So when the fee would have been due, it actually wouldn't have had the fee. It would have had to borrow the money. So the trial court didn't make any factual findings about the benefit at all. It decided that, as a matter of law, it was barred because there is an interest provision in the standard contract, and that was an exclusive remedy. But as we established in our brief, pursuant to this Court's decisions in local Oklahoma and First Heights, there is a remedies provision that provides that that's not an exclusive remedy. So the trial court's analysis was wrong, and the plaintiff doesn't even address those cases in its brief, presumably then conceding that the trial court was wrong on that issue. Do you have a government offering if, as today, where the rate is such that it's lower than the standard contract, that the government would make a refund of the difference? Well, whether the rate was lower. Well, I think that's pretty impossible, Your Honor, because the interest rate in the contract is just the T-bill rate. It should be tied to what the actual rate would be. So if, in fact, the interest income is higher than the rate in the standard contract, you say that the government should get credit. Well— But what if it's lower than the rate in the standard contract? Does the government offer you a refund? Well, Your Honor, it couldn't be because the interest rate is just the low T-bill rate, which is the safety rate, basically. And in this case, the evidence showed that, in fact, this contractor would have had to go out and borrow money to pay the fee. So presumably the benefit here is that the contractor didn't actually have to take a loan out and didn't have to pay interest on that loan. If the trial court agreed with the facts as we presented them, that would be the benefit here, would be the cost savings from not having to take out that loan and pay interest on it. Shouldn't that have been the way the contract was written? Well, the contract was—I mean, I think you're assuming that the trial court is correct, that, in fact, the fact that there was a low interest rate included with regard to the one-time fee provision constitutes an exclusive remedy. But this Court's decisions in local Oklahoma and at First Heights conflict with that notion. It sounds to me like you're asking us to rewrite the contract, though. Not at all, Your Honor. We shouldn't get into that business, should we? Not at all, Your Honor. We are just simply asking that the government be allowed to present evidence and to have the trial court consider on the merits the government's argument that there was a substantial benefit that this contractor got from being able to hold on to this $49 million for 13 years. But the parties made this one-time payment payable upon actual collection, not on some non-breach collection point in time. Certainly, in the breach world— So the contract said—decided this, right? In the breach world, it is not collectible yet because DV hasn't performed. But what we're looking at is, well, what would have happened in the non-breach world and what cost savings, cost benefits, costs would have been incurred in that world should be accounted for in terms of a damages award. But in the non-breach world, that one-time payment's not due. It's not due yet. That's correct. But it would have been in the non-breach world. It would have been. They would have had to have paid it if DOE had timely performed. If DOE performed. That's correct. If DOE hasn't performed. That's correct. But if we're going to look at what the incremental damages are— Are you seeking the benefit for your non-performance here? Not—well, yes, Your Honor. And this court—and in LaSalle, in other cases from other courts, Bono sales that we discussed in our brief, that is certainly even—in Bono sales, they say even for the most horrific breach, if there in fact is a benefit that drives from it, it should be accounted for. Not that it eradicates damages, but it should be accounted for in the damages award, so long as the benefit is direct and not too remote. I would like to just move on to the plaintiff's cross-appeal issues, Your Honor, particularly the interest issue, because this is an issue that seems to be very widespread, of widespread applicability, not only in the SNF cases, but also just in general contract cases before this court. Let me ask you the same question I asked a couple of days ago. How do you deal with Lou Bonnet and Wickham? Well, my first response, Your Honor, is that in this particular case, we don't need to deal with them because all we have in this case is basically a time value of money markup to the nominal damages award. We don't have, as the trial court found, we have no actual borrowings. We have just a mix of debt, a mix of internal debt and equity at the corporation that the contractor then applies to, puts into a weighted average cost of capital calculation, and then it adds that calculation as a markup to the damages that it otherwise would receive. So if the damages award, apart from interest, were zero, the interest award would be zero because there's nothing to mark it up on. So this is simply, and even their own expert witness admitted, pages 1744 and 1776 of the Joint Appendix, that this, in fact, is a time value of money calculation. And as this court recognized in Chu, a CHUI that we discussed in our brief, citing to Library of Congress v. Shaw, time value of money calculations are the same thing as interest. They are not recoverable against the government. And what is the philosophy behind that? Here we have a breach. We are saying that despite the government's breach, because this happens to be money rather than something else, that it's the non-breaching party that should bear the consequences rather than the breaching party. Well, it's because it's interest, Your Honor. That's my question. Yes. Well, what is the government's reason as to why interest on money should be any different when, in fact, it would not have been incurred but for the breach? It is strictly a waiver of sovereign immunity issue, Your Honor. And as the court in— You're saying it's not justifiable other than the matter wasn't explicitly agreed to? I acknowledge, Your Honor, in cases between private parties, private plaintiffs can potentially recover pre-judgment interest from those private parties. But as the Supreme Court held in Library of Congress v. Shaw, the government stands in an apparently favored position, and I quote that from that language, and the Supreme Court has said because of sovereign immunity issues, interest is not recoverable from the government absent an express waiver either by statute or contract. But the Supreme Court said that as far as Tucker Act waivers are concerned, that they are presumed unless explicitly withheld. Is there anything in the Tucker Act which says that when a party breaches the contract, they are entitled to recover the consequences thereof except for interest? Well, with all due respect, Your Honor, in Library of Shaw v. Congress, the Supreme Court expressly said that to establish a waiver of sovereign immunity for interest, that waiver of sovereign immunity for interest must be expressed, and it is separate from the waiver of sovereign immunity for a lawsuit. Yes. So you have to have— That's a different interest. That's interest on a judgment. No, Your Honor, that's simply— There was not interest on a judgment in the Library of Congress. In the Library of Shaw case, there was a— That's your judgment interest on the— Okay. In Library of Shaw, it was a Title VII issue that dealt with an attorney fee issue that the court wanted. I don't know if it was the trial court or the appellate court had loaded up with— had applied an interest calculation to. And the Supreme Court said, no, you have to identify not only a waiver of sovereign immunity to allow for a lawsuit against the government, you must identify a separate waiver that expressly waives sovereign immunity for interest, and it must identify that. Okay, so you have to agree with the distinction that your opponents have drawn as to the source of the interest. The source of the interest. As to the kind of interest, again, whether it's interest on a judgment or whether it's interest on an expenditure that would not have been incurred but for the breach. Well, here, Your Honor, we don't have an expenditure. We have just a markup. The trial court expressly found after trial that there were no specific borrowings. So even under the Wickham line of cases from this court, the plaintiff couldn't recover because there's simply no—there were no specific borrowings here. So you have to agree with that line and that if the utility is sufficiently conservative in its fiscal management, that they happen to have the cash to pay for the construction and so on, for the spent fuel, that, therefore, cash that they might have used for something else, that, therefore, they have to be in a different position. The Supreme Court has made it quite clear that equity awards are not recoverable against the government, Your Honor. I see the rest of my time is gone. Would you like to save the rest? Yes, for rebuttal, Your Honor. Thank you, Mr. Lester. Thank you. Ms. Stetson. Good morning, Your Honors, and may it please the Court. Kate Stetson for System Fuels. Let me speak briefly to the government's two appeal issues, and then we can turn to the cross appeal. We agree that a remand is required for the court to apply the 1987 ACR rate to the causation issue here, so there's nothing more to say on that unless you have questions. On the benefit argument, Judge Lynn, you asked whether this issue was raised in the Yankee cases, and the answer is actually yes. If you look at the Yankee briefing, both the opening brief and the reply, one of the contentions the government makes there is that the reason it's seeking, in that case, a pure offset of the one-time fee was, and I quote, that the Yankee utilities there, the two of them who haven't yet paid the fee, obtain a significant benefit by retaining the one-time fee because they can invest in profit from the money that they retain. There's no daylight between the offset argument that the government made in Yankees, which was decided against it, and the cousin of the offset argument the government's making here. The cases that the government cites, at least the new ones, they cited Blue Monnet in the Yankee cases, they cited LaSalle, they cited White, but there are a couple new ones. They're both from the Third Circuit, they're from the 70s and 80s, and they have to do with circumstances where there was a total breach to begin with and a claim for lost profits where the claimant was able to engage in at least a partial substitute transaction. And, of course, in those circumstances, if you're able to take, as in the Publicker case that the government cites, if you're able to take 1,200 of the 40,000 bottles that you had contracted to sell someone who breached and you're able to sell those 1,200 bottles to somebody else, your lost profits damages get backed out by the sum of 1,200 bottles. That makes sense. But there's no total breach here, as this Court explained in the Yankee cases. Here we have a partial breach, and up until we are required to perform, there is no savings, as the Yankee Court put it, to the government to be attributed to it. Even if the facts are not on all fours in the Yankee Atomic, it's certainly the analysis we seem to apply here. Yes, I agree. So if there are no questions on the benefit argument, turning to cost of capital, as you observed, Chief Judge Rader, this issue has come up in a couple cases already this week. So if I can, let me try to synthesize what seem to be, in our view, two conflicting lines of cases, because I think they are conflicting. One of them, let's call the England line. Meyerly, J.D. Heaton, England, Komatsu would fall into that category. Don't those have the virtue of following the Supreme Court's Shaw case? Well, I think, Your Honor, both of the lines that I'm going to describe have the virtue of following Shaw. The important thing to realize in Library of Congress v. Shaw is that the true quote there is not that interest against the government is prohibited. It's interest on a claim is prohibited. And Judge Newman, as you pointed out, there's a difference between, you know, interest on top of a claim and interest that is part of your mitigation costs. And that actually goes to what I think is the distinction between the two lines of cases. Judge Rader, you asked about Wickham and Bluebonnet. If you look at Bluebonnet, you have a situation where following the government's breach in that case, the passage of FURIA constituted the breach. The investment group there had to go out and seek additional financing in order to essentially infuse the thrift there with regulatory capital. And it was that financing cost, the cost, the additional cost that that investment group incurred because of the breach in order to mitigate the breach that was found to be recoverable in Bluebonnet. The line that I'm trying to draw is this. If you have a cost that is just a cost of performance, for example, if you look at England and if you look at Meyerly almost 100 years earlier, both of them involve circumstances where the contractor in that case had to seek money in order to perform the contract. That's almost a direct quote from Meyerly, in order to fulfill its obligations under the contract. But if you look at Bluebonnet, you have a situation where the money that was spent, at least the increment of financing cost that was found to be claimable as damages, was because that was a cost that the plaintiff in that case incurred as mitigation costs. Cost of performance are not recoverable against the government. Costs of mitigation are. And it doesn't matter whether those costs in mitigation, as you put it, Judge Newman, are costs of capital or some other thing that we had to do or spend in order to mitigate the breach. It all is a cost of damages. And under the Tucker Act, because the Tucker Act waives the government's sovereign immunity for contract claim damages, if it's a contract claim damages award, it's awardable against the government. Is there a distinction to be made between the Wickham line of cases and the Meyerly line of cases on the grounds that in one sense you're talking about interest that flows from equitable adjustments to a contract, and in another sense you're talking about a breach of contract? Judge Lynn, I think this is part of the government's, what I think of as a series of caveats or provisos that it has formulated in order to explain these cases. You know, the government explains the Blue Bonnet and LaSalle line by saying, well, those are Winstar cases. They involve contracts involving money. So those can be differentiated. With respect to Wickham, what the government says, as I understand it, is Wickham cited a case called Bell, and Bell involved a changes clause to a particular contract. And the DOD, back in the 1960s, said that interest was available under changes clauses. Therefore, since Wickham cited Bell, even though it never said anything about a changes clause in Wickham, that must have been the rationale under Wickham. I submit there's an easier way to get at the distinction between Wickham and Blue Bonnet and England, and that is to say what I said earlier, that the cases where damages awards have included financial components like cost of capital, it's because the damages award that cost of capital was incurred in the mitigation of a breach. Where damages award... Excuse me. England, of course, deals very directly with Shaw. Does Blue Bonnet and Wickham, do those deal with the Supreme Court precedent and discuss it? Blue Bonnet and Wickham, to my knowledge, do not directly address or discuss Shaw. But I suggest that that's not a failing of the decisions. It's because both of those decisions understood what Shaw said and what it did not. What Shaw discusses is that interest on a claim is not available against the government. But wouldn't you have expected Blue Bonnet and Wickham to make that point, to explain an apparent divergence from the Supreme Court precedent? I believe, Your Honor, in fact, if you go back and, of course, Blue Bonnet went up and down three times. If my memory is correct, the very first claims court opinion in Blue Bonnet, some of which was sent back ultimately in 2001, but back in 2000, the claims court judge found certain financing costs permissible because they were costs incurred in mitigation. He found others impermissible. He found, for example, the plaintiffs there had claimed, among other things, the costs that they had incurred in financing their purchase of the failing thrift in the first instance. Those costs, if I'm remembering that 2000 claims court decision correctly, were found impermissible under Shaw because they were found to be interest of the sort that's not permitted. They were essentially the cost of performance of the contract. So I think that actually fits neatly into the two categories that have been developed here. Here, just to turn to our facts, if we begin with the understanding that all capital has a cost, as this court put it in LaSalle-Townman, money has value. It comes from somewhere and it costs money. The problem that Mr. Lesser identified with the proof here is actually not a problem on this record. It's certainly correct, and our expert said as much, that when you have a claim for the cost of equity in many circumstances, it's hard to figure out what that cost was. And the claims court has said the same thing in the Dravo case, I believe, and in Gevin and Singer. It's easy to determine the cost of debt because you have an interest rate to look at. It's harder to determine the cost of equity. But if you look at page 1744 of our joint appendix, this is our expert's testimony, that people struggle, he says, with identifying what the equity piece should be when you're talking about cost of capital. But in the regulated utility industry, that's already done for you. They go through a complete vetting process in their rate payer requirements in the revenue requirements methodology, where the main purpose of the battles in a rate making case is to determine what that rate of return on equity should be. And his point, and if you look at joint appendix 2659, you can find this done out in the numbers. His point is that where in another case, and maybe many other cases, you might have a problem establishing your cost of equity in a way that you don't have that problem when it comes to cost of debt, you don't have that problem in this case because the equity cost has already been determined and vetted by the regulators. Ms. Dessen, you essentially used up your time, but I just have one quick question, if you could just touch very briefly on the other cross-appeal point on the capital suspense, the administrative overhead. Yes, thank you, Your Honor. Very briefly. Very briefly. I think the most that I would want to say on the capital suspense loader issue is that the court at appendix 30 found the capital suspense loader excessive without any record evidence establishing why it was excessive. The capital suspense loader, which is that portion of the administrative overhead that is assignable into a pool when you're talking about either work build on multiple projects or work build for just a few minutes of time on one project, was 6.9 percent. And if you look at appendix 29 to 30, what the judge concluded was that because some other overhead was already taken into account in the cost of a particular project, if you added whatever that cost was, it's not in the record, to the 6.9 percent, it was excessive. But the question is excessive compared to what? There's no record evidence establishing why it was excessive, and we know from claims court cases that overheads of 15 percent, 20 percent, sometimes even 25 percent, have been found not to be excessive, to be reasonable. So we think because of that recordless determination, that needs to be sent back as well. Thank you, Ms. Denson. For the last three, you have a minute and a half or so. Wow. Let me just focus on the interest issue very quickly. The Supreme Court has said belated receipt of money is what interest and a delay factor have. Both share this common element, which is they both deal with a belated receipt of money. Here we have had the government paid its costs, SFI's costs, as incurred, there would be no borrowings, there would be no covering of costs. But because it didn't, SFI had to cover the costs. And what it is seeking here is the compensation for the time value of money. Now, in Bluebonnet, that specific case dealt with financing contracts, and, in fact, half of the cash infusion into the thrift had to come from the capital notes that would be issued. So that is separate from what we have here. We have a storage contract. We have much like services and goods contracts that we typically have. There's nothing about financing in this contract. The Wickham line, that Wickham decision couldn't eradicate decades of precedent with regard to, especially Supreme Court precedent, with regard to the unavailability of interest, affirmative, clear, and unambiguous waiver of sovereign immunity. J.D. Heaton, in fact, specifically talks about, refers to Bell, which is the predecessor of Wickham, and distinguishes that case, which has a changes clause in it, from a breach case, which we have here. With regard to the capital suspense letter, we would just cite to the Carolina Power, this court said that the trial court has wide discretion in assessing appropriate quantum of damages, and in Consolidated Edison, a recent trial court decision, the trial court there had some language there that further explains the reasons that capital expense letters are not appropriately comparable. Thank you, Your Honor. We would ask the court to grant the government's appeal and deny the plaintiffs. Thank you. Thank you, Mr. Lester. Ms. Stetson, you have your rebuttal time. Thank you. Let me begin with Bluebonnet again, and I want to reiterate that there were two types of financing charges that were claimed in Bluebonnet. One was permitted and one was denied. The charge that was permitted had nothing to do with the original contract. This is the argument that I was referencing earlier in my first argument with respect to the government, saying, well, because the Windstar cases all involve contracts for money, you know, the financing was the essence of the contract. It's actually not so. When it comes to Bluebonnet, the money that the Bluebonnet plaintiffs got by way of cost of capital damages was the money that they incurred after the breach, after FERIA was passed, when it became exceedingly difficult for those plaintiffs to obtain financing in order to get that capital infusion into their bank. It had nothing to do with the original contract. Again, I think the most easy way, the most efficient way, and the way that doesn't violate Supreme Court precedent to reconcile England and Wickham and Bluebonnet is to understand that one of them involves an element of damages. Interest on a capital investment, cost of capital, financing, whatever nomenclature you want to assign to it is properly a part of damages if that money has been actually laid out in mitigation, and clearly it was here. But that's interest. It's the time value of money, and that's exactly what is at stake here, isn't it? No, I think that's, Chief Judge Rader, I think that is not quite accurate when it comes to distinguishing between interest on a claim, not to harp on that too much, and interest as a component of damages. When you're talking about, as Judge Newman said this earlier, when you're talking about interest on a judgment or interest on a liquidated amount that you say the government owes you, the government owes me $100,000. I can't start the interest clock and expect to get paid $107,000 at some point in the future because that's interest on a claim. Here, however, what we're talking about is interest as a component of a claim. It's a financing cost just like any other cost. England is allowed both. Because England is wrong. England involved the category that I described earlier of a cost of performance. The contractor in England, when he initiated the contract, he went out and secured a loan. The payments from the government that were due to that contractor, he assigned to the lender, and when the government was late with those payments under the contract, the contractor ended up having to pick up some of the financing costs. I'm struggling to discern why the cost of performance ought to be different from the cost of mitigation. That's your argument, that there's a distinction between performance and mitigation. Why is there a distinction? Well, I think there's a distinction because the latter is properly claimable as damages. When you talk about a mitigation cost, and this goes back to the Tucker Act point, we already know that there has been a waiver of governmental immunity when it comes to damages claims against the government. So if something can be put in the cost of mitigation category, whether it is any kind of cost, including cost of capital, falls into that category. Does this consist with the Supreme Court's decision in Shaw, which seemed to indicate that the character or nature of interest cannot be changed by calling it damages? Judge Lynn, the issue in Shaw, as Mr. Lester referenced, had to do with whether or not it was proper to essentially assign a post hoc cost of living adjustment to attorney's fees in that case. And if you think about it in terms of the way I described it earlier, if you have a money claim against the government and it's liquidated, you can't start tacking interest on top of that claim. If you incurred fees litigating against the government back in 1985, those fees at that time, the lodestar was whatever it was back then, $100 an hour, call it. It's not proper, the court said in Shaw, and the court said in Chu, which was the other case Mr. Lester referenced, to add a cost of living adjustment to true that $100 up until it actually gets paid, because that's interest on top of a claim. That's interest on an amount that was owing at the time, but that continued to accrue. Here, however, what we're talking about is a part of the damages claim. This is money, and if you look at Joint Appendix 1744-48, it's very clearly set forth by the expert. This is money that was actually expended in service of the equity lines and the debt lines that Entergy System Fuels had to call on in order to fund the projects that it needed to engage in because of the government's breach, in mitigation of the government's breach. If there are no further questions, I see my time is up. Thank you.